Michael Bright, Plaintiff-Appellant, v. City of Evanston, a Municipal Corporation, Defendant-Appellee.

Gen. No. 49,651.

First District, Third Division.

April 1, 1965.

L. Louis Karton, of Chicago, for appellant.

Jack M. Siegel, Corporation Counsel, City of Evanston, Russel A. Behrens, Assistant Corporation Counsel, both of Evanston, for appellee.

MR. JUSTICE SULLIVAN delivered the opinion of the court.

This appeal is brought by the plaintiff from an adverse decision by the trial court in a declaratory judgment action seeking the court to declare unconstitutional and void the zoning ordinance of the city of Evanston restricting certain property to R–1 single-family use. The testimony of the many witnesses can be summarized as follows:

The subject property is located on the southwest corner of Davis Street and Judson Avenue in a R–1 zoning classification in the city of Evanston. Under R–1 zoning only single-family dwellings may be constructed on the premises.

The plaintiff testified that he is the owner of the beneficial interest in the subject property; that he is a realtor; that he buys and sells property for his own benefit, and that he had been engaged in that business since 1940. Plaintiff acquired the property in November 1954, for $12,515.48 with the knowledge that the property was zoned for single-family dwelling purposes, and that litigation had been pending since 1952 to enable an eight-story multiple dwelling to be built. At the time of the purchase of the property he had no intention of building a single-family residence, and he purchased the property to put a high-rise building on it.

The property has a total frontage of 100 feet on Davis Street and 138.5 feet along Judson Avenue. It has been zoned for single-family purposes since 1921, when the first zoning ordinance was adopted by the

city. The R–1 single-family residence district wherein the subject property is located has an irregular western boundary. Directly behind the subject property the western boundary is the alley between Hinman and Judson. On the east the district is bounded by Lake Michigan, which is approximately two blocks from the subject property, on the south by Lee Street, some six blocks to the south, and on the north by Clark Street, two full blocks to the north of the subject property. The subject property is surrounded on all sides by property zoned and used for R–1 purposes. Immediately to the west is a large single-family residence in excellent condition and well kept. To the west of this residence and approximately ninety feet from the west edge of the subject property is the alley which forms the zoning district boundary. The Georgian Hotel building, which was built in 1926, and which the record indicates was to become an old peoples home on January 1, 1964, lies west of the alley in an R–7 district which fronts on Hinman Avenue. South of the subject property is a single-family residence purchased in 1952 for $27,500, and thereafter improved by an additional $5,000 expenditure. Its present value is estimated at $34,000. The remainder of the block south of the subject property on both sides of Judson is improved with single-family residences. South of Grove Street the single-family district runs west to Hinman Avenue. Directly across Davis Street to the north of the subject property is a large single-family residence. Just west of that residence are two single-family lots which are vacant. Two residences which were located on these lots have been torn down. Most of the area of these lots is landscaped but there was a small parking area on the north end at the time of the trial. The evidence discloses that this was an unlawful and unauthorized use and steps were being taken to eliminate it. Northward on both sides of Judson are

well maintained single-family residences. Across Judson Avenue directly to the east of the subject property is a single-family residence built in 1955, and purchased in 1956 for $49,500. Directly to the east of that building is another residence fronting on Davis Street which was purchased for more than $50,000 some ten years ago, and further improved by the expenditure of an additional $10,000. On both sides of Davis Street to the east are comparable structures. To the west of the alley between Judson Avenue and Hinman Avenue on Davis Street is the Mather Home having a height of eight stories, and is situated at the northeast corner of Davis and Hinman. The Georgian Hotel on the southeast corner of Davis and Hinman is likewise eight stories high, and has a restaurant on the ground floor, the windows of which face on Davis Street. It extends from the alley to Hinman Avenue. The balance of the west half of the block south of the Georgian Hotel is devoted to multiple-family buildings. The balance of the west half of the block north of the Mather Home is devoted to multiple-story buildings.

This property has been in litigation since 1952, and the plaintiff purchased his interest while litigation in a previous case was pending and became the plaintiff in that case. The title of that case is Bright v. City of Evanston, 10 Ill2d 178, 139 NE2d 270. The Supreme Court in that case instructed the trial court to dismiss the complaint for summary judgment for the reason that the plaintiff had not exhausted his administrative remedies. The plaintiff then sought administrative relief and upon denial brought the present suit.

An architect for the plaintiff testified as to the details of the 7-story 32-apartment building which the plaintiff proposed to erect on the subject property. It would be 62 feet 8 inches high, masonry exterior walls and concrete floor slab construction, with two elevators, three stairways, and air-conditioned. It

418

would comply with all the Evanston Code provisions applicable to an R–7 use district. There would be offices, two dwelling units and 12 parking stalls, in addition to the lobby, on the ground floor. The entrance would be on Judson, with a driveway to the basement garage on Davis at the west end of the building. The R–1 height limit for residential buildings is 35 feet. The architect who had drawn plans for this building testified that in his opinion the most suitable use for the subject property was a seven-story 32-apartment building. That the zoning and uses to the west of Hinman Avenue are business and commercial for more than a half-mile. He felt that the influence on the subject property of the 85 foot high Georgian Hotel, even though more than 90 feet to the west of the subject property, was greater than the single-family 60 year old building immediately west of it.

The plaintiff also testified that he was the owner of a 7-story 120-apartment building and a 3-story 25-apartment building in Evanston, and that in his opinion the highest and best use for the subject property was a high-rise building.

The real estate witnesses called by the plaintiff testified that the value of the property for residential purposes was from $10,000 to $12,500, and for a multiple-story building the same property would be worth $50,000. One of these witnesses testified that he had examined the land east of the alley between Judson and Hinman to the lake and all of that property was residential. That the value of the homes was substantial, particularly east of Judson, with a minimum of $25,000 or $30,000 and running up to $60,000 to $75,000.

One of plaintiff's real estate witnesses testified in addition to the foregoing that there is a preponderance of old frame homes, 60, 70 and 80 years old; that the newest home is across the street from the subject property at Judson and Davis and was built in 1954,

419

and another to the east of it was built at about the same time but that all the rest were old. He also stated that when you start mixing new houses with houses 40 to 50 years old you are mixing the market. This witness testified that the only adverse effect of such a development would be a slight effect on the old house to the south. He testified that the construction of a 7-story building on the said property would cause no more detriment than had already been created by the Georgian Hotel.

The Director of Planning for the defendant testified that the subject property is oriented toward Judson Avenue; that all the residences in the area are well maintained and structurally sound; that the area is one of three in Evanston which contain the bulk of Evanston's high value single-family residences. That according to the 1960 census, the two blocks of Judson north of Davis average $42,000 value per home. The subject block and the one east contain homes with an average value of $37,000 to $38,000; that in his opinion the highest and best use of the property is for single-family use comparable to what immediately adjoins it, to retain the continuity in the neighborhood. The reasons he assigned for his opinion were the orientation of the subject property toward Judson; the high quality, well maintained single-family residences for over a block in each direction on both sides of Judson; that the residences in that area give Evanston its unique character, being some of the larger, older homes in the community which have been well maintained and steadily improved. The few remaining lots have been utilized in recent years. There was continued pressure to develop the area for single-family uses, even to the point of rebuilding existing structures for new single-family purposes. That for forty years the city has stated its policy to maintain this as a quality single-family neighborhood. That policy is reflected in the

420

land use plans of the 1930s, 1940s, 1950s, and in the zoning revisions in 1930, 1940 and 1960. Judson Street has relatively little traffic, relatively narrow pavement, wide parkways and trees, and a higher density would increase traffic volume and ultimately result in widening the streets and loss of the trees in parkways. This would, in his opinion, adversely affect the area. Another consideration given by this witness is the principle common in current planning of having common uses face each other across the street rather than have incompatible uses on opposite sides of the street; that incompatible uses should adjoin at the rear rather than opposite at the front. Current planning has been to protect this area by discouraging through traffic on Church and Davis. The proposed improvement anticipates a density 32 times greater than the density upon which plans for the area for streets, use and public facilities have been based. That if the zoning on the subject property were to permit the proposed use it would become difficult to find a logical boundary line.

Another witness for the defendant was a planning and zoning consultant with years of experience in preparing plans and zoning recommendations for many municipalities. He described the area as a neighborhood of older homes, single-family, some of very recent construction; a neighborhood of fine architectural development, of considerable variety with considerable continuity of development; it was unique in terms of no adverse effect from traffic or noise. The maintenance and upkeep of the structures is excellent. That from a zoning and planning standpoint the highest and best use of the subject property was for single-family residential purposes. The area is unique in that it is convenient to many facilities yet removed from noise, congestion and nonresidential uses; it is a quiet residential area with a minimum of traffic even though

421

close to a business district, and has not been intruded by nonresidential uses. That the alley zoning boundary line orients the Georgian Hotel and Hinman Avenue multiple uses to Hinman Avenue, and the subject property is oriented to Judson and the single-family area to the east. He expressed the opinion that the highest and best use was for a single-family home in the $40,000 to $50,000 class, plus the lot. In his opinion the 85-foot high Georgian Hotel had no effect on the subject property and was not the cause of its not being improved during all these years.

Other witnesses for the defendant, who were familiar with the area and had appraised properties in the area during the past fifteen years, were, likewise, of the opinion that the subject property was highly desirable for single-family purposes, and that the multiple use property west of the alley did not affect its desirability for such use because the property next to the alley to the west of the subject property was single-family and the alley was a zoning buffer.

One real estate appraiser for the defendant testified that in his opinion properties immediately to the south and west would be affected in loss of value as much as 25% and would taper down to the corner. The properties across the street would be depreciated because of the inharmonious use in a well established single-family area. Traffic would increase in and out of two entrances from Davis Street and Judson Avenue, and there would be additional cars and service trucks.

The evidence of the defendant further showed that there was a definite market for single-family residences in the area, and that an individual desiring to build a single-family home on the subject property would be justified in spending at least $40,000 to $55,000. To the knowledge of the defendant's witnesses the subject property had never been listed for sale.

Another real estate witness testified that this area was the number one residential area in Evanston, and that the market value of the property immediately adjoining the subject property would be depreciated by 25% and less as one went further away. This witness said that if the lot had been available for sale he knew at least three builders who would be interested in it.

The evidence further showed that the plaintiff had been offered for the subject property about $18,000 several years before the trial. He said that he had received an offer in 1955, in 1957 and the last one was in 1959. That a Mr. Lucas offered him $20,000 if he could resubdivide the property for two residences, but that he was not interested in selling at that figure. He also testified that he had put about $30,000 in the property and he wanted to get his money out. From the evidence it would appear that he arrived at the $30,000 figure by adding the cost of the property plus his costs of litigation, and taxes that are about $450 a year. The subject property is 600 square feet short of the requirement for two single-family units under the R–1 classification. Plaintiff refused to seek the variation, since he bought the property for multiple use and would not consider taking less than $30,000 for the parcel.

The real estate witnesses for the defendant testified that the subject property as presently zoned is worth from $20,000 to $25,000. Several property owners living in the immediate vicinity of the subject property testified for the defendant. All of them testified that they had investigated the zoning in the area before buying and would not have purchased their property if the subject property had been zoned or used for multiple-family purposes. All testified that the proposed use would be detrimental to their property. One such owner, who lives 200 feet from the subject proper-

423

ty paid $42,500 for his two-story brick and stucco residence in 1956 and has invested between five and seven thousand dollars in it since then. He thought the value was between $55,000 and $57,000 in the present market.

Another property owner, who also lives about 200 feet from the subject property paid $32,500 for his home in 1948 and spent $20,000 remodeling it two years before he testified. He also pointed out that considerable improvements had been made by his neighbors to their homes.

The owner of the third house east of the subject property on the north side of Davis Street paid $32,000 when he acquired his home in 1955 and has invested an additional $10,000.

Another witness, who lives in the third residence north of Davis Street on the east side of Judson, said he paid $40,000 for his home in 1958 and has since expended $7,000 in improvements. He further testified that houses are in amazing demand in the area and there are none for sale. He thought the present market value of his home was at least $50,000, and it is not for sale.

Another witness testified that he rents a home at 401 Davis Street directly across the street from the subject property. That he would like to purchase it when his lease expires but would not do so if the proposed improvement went in. He further testified that the Mather Home and the high-rise buildings on the west half of the block facing Hinman do not have an adverse effect on the desirability or liveability of his home; that when you cross the alley the character of the neighborhood changes.

Another owner testified that she lives at the southeast corner of Davis and Judson, directly across the street to the east from the subject property; that she and her husband acquired the property in 1956 for

$49,500 and have invested $5,000 more in the house; that she and her husband were interested in the subject property for a single-family home but the property was not available. She testified that the presence of the Georgian Hotel has not impaired her enjoyment of her property, but she would not have bought it if the subject property was improved as proposed.

Another witness who resides in the second house to the east of the subject property on Davis Street testified she bought her property ten years ago for over $50,000 and has spent an additional $10,000. She wouldn't sell it for less than $70,000.

An owner, who resides in the second building south of Church Street on the east side of Judson, testified he bought his property in 1960 for $41,000 and has invested an additional $25,000. That the area along Hinman provides a buffer from the downtown area and in no way impairs the enjoyment of his property for single-family purposes.

 Our courts have consistently held that a municipal zoning ordinance is presumed valid and the party assailing its validity must show by clear and convincing evidence that it is invalid. If there is any room for a reasonable difference of opinion the court will not substitute its judgment for that of the legislative body. Reeve v. Village of Glenview, 29 Ill2d 611, 195 NE2d 188; Trendel v. County of Cook, 27 Ill2d 155, 188 NE2d 668; Exchange Nat. Bank of Chicago v. County of Cook, 25 Ill2d 434, 185 NE2d 250; Bennett v. City of Chicago, 24 Ill2d 270, 181 NE2d 96; Sutter v. Village of Mundelein, 27 Ill2d 589, 190 NE2d 321; Chicago City Bank & Trust Co. v. City of Highland Park, 9 Ill2d 364, 137 NE2d 835; Rams-Head Co. v. City of Des Plaines, 9 Ill2d 326, 137 NE2d 259. However, the presumption of validity may be overcome where the evidence shows a destruction of property value in the application of the ordinance, and an ab-

sence of any reasonable basis in public welfare requiring the restriction and the resulting loss. First Nat. Bank & Trust Co. of Evanston v. County of Cook, 15 Ill2d 26, 153 NE2d 545; Illinois Nat. Bank & Trust Co. of Rockford v. County of Winnebago, 19 Ill2d 487, 167 NE2d 401.

Each case must necessarily be considered on its particular facts and circumstances. La Salle Nat. Bank of Chicago v. County of Cook, 12 Ill2d 40, 145 NE2d 65.

The plaintiff here points to the fact that the subject property has always been vacant, and therefore the limitation to single-family residence use is unreasonable, arbitrary and capricious. The plaintiff further points to the testimony in the case that vacant single-family lots were in great demand in this neighborhood and that it was one of Evanston's three finest neighborhoods; one witness said that it was its finest. It is close to the downtown shops and stores, transportation, school and other conveniences. The few remaining lots in the neighborhood have been improved in the past few years yet this lot remains vacant. It is the plaintiff's contention that the reason this lot remains vacant is because of the Georgian Hotel which rises 85 feet and which is separated from the subject property only by a lot improved with a residence to the west and an alley, both the alley and the lot together being less than 100 feet from the Georgian Hotel. The plaintiff also says that it is not surprising that no one has ever considered this property a proper location for a single-family dwelling. In so stating the plaintiff overlooks the testimony of the owner of the home immediately across Judson Avenue to the east, who testified that at the time she and her husband purchased their home in 1955 they would have been interested in the subject property had they known it was for sale. Plaintiff also apparently overlooks the fact that he

426 .

testified that having purchased the property in 1954 for $12,515.48 he had an offer in 1955, another offer in 1957, and a third offer in 1959 of $20,000 if the property could be subdivided to permit the construction of two residences. One of the earlier offers was for $18,000 for the property as presently zoned. His reason for turning down the offers to purchase the property was because he wanted $30,000 out of the property to cover his litigation costs and taxes he had paid, and that he was unable to get that price for single-family purposes. Litigation costs and real estate taxes paid are not elements considered in determining the market value of real estate. He was offered a profit of approximately $5,500 for the lot which he acquired for approximately $12,500. In support of his contention that the subject property is not suitable for single-family residence uses plaintiff cites The People ex rel. Chicago Title & Trust Co. v. Reiter, 25 Ill2d 41, 182 NE2d 680. In that case, the court found the property not suited for residential use; however, the property fronted on Dempster Street which the court described as "one of the most important east-west traffic arteries connecting the lake and the western suburbs, and carries a large amount of traffic." Also in the Reiter case Dempster Street had developed as a business and commercial street and was so zoned except for the subject property and one other tract considerably to the east. The court properly found that the subject property in that case was characterized by Dempster Street.

In support of the plaintiff's contention that the property may never be developed residentially he also cites the following cases: Trust Co. of Chicago v. City of Chicago, 408 Ill 91, 96 NE2d 499; Chicago Title & Trust Co. v. Village of Franklin Park, 4 Ill2d 304, 122 NE2d 804; Chicago Title & Trust Co. v. Village of Wilmette, 27 Ill2d 116, 188 NE2d 33; Krom v. City of

Elmhurst, 8 Ill2d 104, 133 NE2d 1; Petropoulos v. City of Chicago, 5 Ill2d 270, 125 NE2d 522; La Salle Nat. Bank v. City of Evanston, 24 Ill2d 59, 179 NE2d 673; Liebling v. Village of Deerfield, 21 Ill2d 196, 171 NE2d 585; Bullock v. City of Evanston, 5 Ill2d 22, 123 NE2d 840, and Tower Cabana Club v. City of Chicago, 5 Ill2d 11, 123 NE2d 834.

In Trust Co. of Chicago v. City of Chicago, 408 Ill 91, 96 NE2d 499, the property was on South Shore Drive in the intensely developed South Shore district. The property was characterized by the apartment development to the south and west. It was there held unreasonable to pick out a half block for special treatment. It would similarly appear to be unreasonable to pick out the subject property, surrounded by single-family uses, for special treatment.

Chicago Title & Trust Co. v. Village of Franklin Park, 4 Ill2d 304, 122 NE2d 804, involved the rezoning from industrial to residential of a tract surrounded on three sides by industrial uses.

Chicago Title & Trust Co. v. Village of Wilmette, 27 Ill2d 116, 188 NE2d 33, involved a corner at Lake and Skokie Boulevard close to Edens Expressway. The traffic count for twenty-four hours was 25,000 vehicles. Two of the other corners were commercial. One was being used for an eight acre nursery and land-scaping business, and the other was the site of Edens Plaza Regional Shopping Center composed of twenty-three to twenty-five retail businesses and parking facilities for approximately 1,200 cars.

It can easily be seen that none of these three cases even remotely resembles the situation presented by the instant case.

We have examined all of the cases cited by the plaintiff on this point and all are equally distinguishable from the instant case. Furthermore, as the Supreme Court in the case of Trendel v. County of Cook,

27 Ill2d 155, 188 NE2d 668, said at page 162: "Failure to sell may well be due to overpricing rather than unsuitable zoning."

The plaintiff next urges that the highest and best use of the subject property is clearly for a high-rise apartment building. In support of this argument he points out that the west half of the square block containing the subject property is devoted to multiple-family uses, and that this is equally true of the west half of the block immediately to the north. The plaintiff takes the position that the traffic makes single-family residential use impractical. In support of this contention plaintiff again cites Petropoulos v. City of Chicago, 5 Ill2d 270, 125 NE2d 522. That case involved property at the corner of Cicero and Foster Avenue in the city of Chicago. These streets were described by the court as being major traffic arteries accommodating large masses of motor traffic for the northerly suburban area of Chicago. The traffic on Davis Street and on Judson Avenue was characterized by the city's traffic engineer as being extremely lightly travelled, 1,500 cars for 24 hours on Davis, a one-way street, westbound, and 751 cars both ways on Judson Avenue.

■ The plaintiff correctly points out that in determining the validity of a given zoning restriction consideration is given to the character of the neighborhood, the existing uses and zoning of nearby property, the amount by which property values are decreased, the extent to which this diminution of value promotes the health, safety, morals or general welfare of the public, the relative gain to the public as compared to the hardship imposed on the individual property owner, the suitability of the subject property for the purpose for which it is zoned, and other relevant factors and he cites Illinois Nat. Bank & Trust Co. of Rockford v. County of Winnebago, 19 Ill2d 487, 167 NE2d 401.

The defendant cites Standard State Bank v. Village of Oak Lawn, 29 Ill2d 465, 194 NE2d 201, wherein the court said: "Of paramount importance is the question as to whether the subject property is zoned in conformity with surrounding existing uses and whether those uses are uniform and established. (River Forest State Bank & Trust Co. v. Village of Maywood, 23 Ill2d 560, 563; Wehrmeister v. County of Du Page, 10 Ill2d 604, 608–9.)"

To the same effect are Treadway v. City of Rockford, 28 Ill2d 370, 192 NE2d 351; Gregory v. City of Wheaton, 23 Ill2d 402, 178 NE2d 358; River Forest State Bank & Trust Co. v. Village of Maywood, 23 Ill2d 560, 179 NE2d 671; First Nat. Bank of Lake Forest v. County of Lake, 7 Ill2d 213, 130 NE2d 267.

The subject property is completely surrounded by residences and is characterized by substantial single-family homes. While the testimony shows that some of these homes are very old, they have been exceptionally well maintained, repaired, improved and landscaped. The values of some of them are as high as $75,000.

While it is true the subject property is less than 100 feet from an area zoned for R–7 use, which includes high-rise buildings, nevertheless, it is completely surrounded by residences, and for the court to invade this neighborhood and in effect rezone one lot which does not even border on the high-rise area would, in our opinion, constitute spot-zoning by the court, which is prohibited so far as the legislative body is concerned. Two city planning experts testified on behalf of the defendant that the single-family use was the highest and best use of the subject property. One of them based his opinion on the single-family uses surrounding the property, the orientation of the property toward Judson Avenue, the continued development in the area for single-family uses, the well

established boundary, and the current planning principle of having common uses face each other across the street. He further felt that incompatible uses should adjoin at the rear rather than opposite at the front.

One of the defendant's witnesses pointed out that the Georgian Hotel and other multiple-story units to the west of the alley acted as a desirable buffer between the downtown area and this fine, quiet residential community.

The plaintiff, from the evidence adduced at the trial, finds himself in the unusual position of contending that the high-rise multiple uses oriented toward Hinman Avenue, which uses are located some 100 feet away from the rear of the subject property and separated from it by an alley and another residence, render the subject property unusable for single-family purposes. Yet, at the same time, the plaintiff contends that a 7-story apartment building, facing Judson and surrounded on all sides by single-family residences in the heart of a fine single-family community, is the highest and best use and would not be detrimental to the surrounding area. If, by analogy, the plaintiff were permitted to change the use of the subject property, the property to the north, south, east and west, presently devoted to single-family uses, would no longer be oriented to an R–1 use but would be oriented to an R–7 use, which would, if the argument of the plaintiff were to be sustained, require the rezoning of all of the properties to the north, south, east and west to an R–7 use, and would gradually destroy all of what now appears to be a fine residential area.

In our opinion the limitation placed upon the property for single-family residence uses would not impose a financial loss to the plaintiff to an extent that would warrant a change in the zoning. The plaintiff's real estate appraisers testified that the subject property was worth $10,000 to $12,500 for residential purposes,

431

and $50,000 if an R–7 use were permitted, yet the plaintiff, himself, testified that he was offered $18,000 for the premises by one party, and that another party had offered him $20,000 if a variation could be obtained to permit the construction of two single-family residences on the property.

The defendant's real estate appraisers testified that the property was valued at between $20,000 and $25,000 as presently zoned. Little weight can be accorded the testimony of the plaintiff's witnesses as to value in view of the offers admittedly received by the plaintiff for the subject property. The plaintiff purchased the property for $12,515.48, and was thereafter offered $18,000 for it. It seems clear that the plaintiff will not sustain a great financial loss by reason of the restriction, but that he is able to derive a substantial profit from his investment. The plaintiff, in support of his contention that a single-family residence limitation will impose great financial loss on him, cites Tews v. Woolhiser, 352 Ill 212, 185 NE 827; Midland Elec. Coal Corp. v. County of Knox, 1 Ill2d 200, 115 NE2d 275, and La Salle Nat. Bank of Chicago v. County of Cook, 12 Ill2d 40, 145 NE2d 65.

██ From these cases it may be safely said that where the owner suffered a loss such factor is not controlling, nor is the mere loss in value alone significant. If it is shown there is no reasonable basis of public welfare that requires the limitation or restriction and resulting loss, the ordinance fails and the presumption of validity is dissipated.

It has been pointed out in Reeve v. Village of Glenview, 29 Ill2d 611, 195 NE2d 188, that the mere fact that plaintiff's land will be worth more if the existing ordinance was invalid is not determinative and does not necessarily justify a conclusion that the ordinance is confiscatory.

In Ryan v. City of Elmhurst, 28 Ill2d 196, 190 NE2d 737, the court held that even though there is a substantial difference in the value of the tract depending upon the zoning classification, that is usually true and is not in itself decisive. The court there also held as we now hold that the evidence was neither clear nor convincing that the property could not be sold for residential purposes. Also see Cosmopolitan Nat. Bank of Chicago v. Village of Mount Prospect, 22 Ill2d 463, 177 NE2d 365; Jacobson v. City of Evanston, 10 Ill2d 61, 139 NE2d 205; First Nat. Bank of Lake Forest v. County of Lake, 7 Ill2d 213, 130 NE2d 267; Exchange Nat. Bank v. Village of Niles, 24 Ill2d 144, 180 NE2d 462; Cities Service Oil Co. v. Lake County, 26 Ill2d 176, 186 NE2d 265, and Trendel v. County of Cook, 27 Ill2d 155, 188 NE2d 668.

While we are mindful of the fact that the acquisition of property with knowledge of the R–1 zoning does not deprive the plaintiff of a right to have it declared invalid, Trust Co. of Chicago v. City of Chicago, 408 Ill 91, 96 NE2d 499; People ex rel. Chicago Title & Trust Co. v. Reiter, 25 Ill2d 41, 182 NE2d 680, nevertheless, plaintiff has been put in a less favorable position. In Treadway v. City of Rockford, 28 Ill2d 370, 192 NE2d 351, the court held that persons who purchased property knowing its restricted status for residential purposes are not in the same position as land owners whose property is subsequently zoned for more restrictive purposes than existed at the time of the purchase. See also Standard State Bank v. Village of Oak Lawn, 29 Ill2d 465, 194 NE2d 201.

In American Nat. Bank & Trust Co. of Chicago v. City of Chicago, 30 Ill2d 251, 254, 195 NE2d 627, the court said the following:

"The beneficial owner, Valenti, is a building contractor and realtor of more than 20 years experience, who has built and sold many homes in this area. He purchased the four lots, secured the vacation of the alley, purchased the alley portion and joined the five parcels into an odd-shaped tract, all with full knowledge of the single-family zoning classification. While a purchaser is not precluded from challenging a pre-existing zoning classification, his purchase in the face of the zoning restrictions, is a factor to be considered. (Vedovell v. City of Northlake, 22 Ill2d 611.) As we have said where a purchase was made with full knowledge of the existing classification, '. . . [I]t is not unreasonable to suppose that the price paid was commensurate with that purpose. Under these circumstances, it can hardly be found that the ordinance has diminished the value of plaintiff's property or is confiscatory.' Elmhurst Nat. Bank v. City of Chicago, 22 Ill2d 396, 402–403."

The court in that case concluded, under the circumstances, the hardship, if any, upon plaintiff by virtue of the zoning classification did not justify a holding that the zoning ordinance was unreasonable, invalid and unconstitutional as applied to plaintiff's property. The plaintiff in this case, like Valenti, the beneficial owner in the American Nat. Bank & Trust Co. of Chicago case, was a realtor of more than 20 years experience. He knew the zoning classification of the subject property at the time he purchased it and admitted that he did not purchase the property intending to conform with that use.

The subject property has been described as being in the number one residential area in Evanston. The homes in this area, many of which are very old, have

been extremely well maintained. The architecture of the old buildings interspersed with the newer buildings adds to the charm of this area. It is one of three mentioned areas in Evanston which, because of the zoning laws, lends itself to gracious living in that city.

Great stress has been laid upon the fact that within 100 feet to the west of the subject property R–7 zoning is permitted. Zoning boundaries must end someplace, and having them end at an alley is, in our opinion, less objectionable under the facts in this case than having them end on a street where incompatible buldings would face each other. In Williams v. Village of Schiller Park, 9 Ill2d 596, 138 NE2d 500, the court said:

> " 'It is axiomatic that zoning must begin somewhere and end somewhere,' (DeBartolo v. Village of Oak Park, 396 Ill 404, 411;) so, even though property touches on industrially zoned areas, a residential classification is not thereby necessarily precluded."

From the record in this case the plaintiff has failed to sustain the burden of overcoming the presumptive validity of the zoning ordinance as it relates to the subject property.

Affirmed.

DEMPSEY, P. J. and SCHWARTZ, J., concur